IN RE: INQUIRY CONCERNING A JUDGE, NO. 240, GREGORY R. HAYES, RESPONDENT

No. 139A01-2

(Filed 22 November 2002)

**Judges— recommendation of removal from office dismissed— clear and convincing evidence standard**

The Judicial Standards Commission's recommendation that respondent judge be removed from judicial office based on misconduct for alleged sexual advances toward a deputy clerk of court is not accepted and the proceeding is dismissed, because: (1) the evidence taken as a whole is equivocal, contradictory, and in many instances ambiguous; (2) the testimony of witnesses places the evidence in equipoise; and (3) the evidence does not establish by clear and convincing proof that respondent has pursued any course of conduct that demonstrates that he knowingly and willfully persisted in indiscretions and misconduct which our Supreme Court has declared to be, or which under the circumstances respondent should have known to be, acts which constitute willful misconduct in office and conduct prejudicial to the administration of justice which brings the judicial office into disrepute.

Justices ORR and MARTIN did not participate in the consideration or decision of this proceeding.

This matter is before the Supreme Court pursuant to N.C.G.S. § 7A-376 upon a recommendation by the Judicial Standards

IN RE HAYES

[356 N.C. 389 (2002)]

Commission entered 16 April 2002 that respondent Gregory R. Hayes, a judge of the General Court of Justice, District Court Division, Twenty-Fifth Judicial District of the State of North Carolina, be removed from office. Considered in the Supreme Court 12 September 2002.

*William N. Farrell, Jr., and James J. Coman, Special Counsel, for the Judicial Standards Commission.*

*Sigmon, Sigmon, Isenhower & Poovey, by W. Gene Sigmon and Nathaniel J. Poovey; and Sigmon, Clark, Mackie, Hutton, Hanvey & Ferrell, P.A., by E. Fielding Clark, II, and Forrest A. Ferrell, for respondent-appellant.*

WAINWRIGHT, Justice.

This proceeding is before the Court upon the recommendation of the Judicial Standards Commission that Gregory R. Hayes (respondent), a judge of the General Court of Justice, District Court Division, Twenty-Fifth Judicial District, be removed for willful misconduct in office and for conduct prejudicial to the administration of justice that brings the judicial office into disrepute in violation of Canons 1, 2A, and 3A(3) of the North Carolina Code of Judicial Conduct. By letters dated 18 March 1999, 4 August 1999, and 24 September 1999, the Commission notified respondent that it had ordered a preliminary investigation into matters involving an equitable distribution case, sexual advances toward a deputy clerk of court, and acceptance of gifts and favors from attorneys who appeared before him, to determine whether formal proceedings should be instituted against him. The correspondence informed respondent of the matters to be investigated, that the investigation would remain confidential in accordance with N.C.G.S. § 7A-377 and Commission Rule 4, and that respondent had the right to present for the Commission's consideration any relevant material that he might choose.

More specifically, the alleged matter addressed in the letter dated 18 March 1999 was based upon a complaint filed with the Commission by Morganton, North Carolina, lawyer Larry A. Ballew. Ballew alleged improprieties in respondent's denial of his motion to continue an equitable distribution case (*Ross v. Ross*, Burke County file number 97 CVD 302) in which Ballew appeared as counsel. Ballew was later interviewed by an SBI agent concerning the matters relative to the *Ross* complaint. It appears from this interview with Ballew that the focus of the investigation shifted to matters concern-

ing claims by Tanya Lynn Isenhour, a deputy clerk in the Burke County Clerk's Office. Allegations as to respondent's actions toward Isenhour were addressed in the notice letter dated 4 August 1999 and are the subject of the instant proceeding. The allegations made by Ballew concerning the *Ross* case and the allegations of respondent's acceptance of gifts and favors from attorneys, as contained in the 24 September 1999 notice letter to respondent, were apparently dismissed by the Commission at the preliminary investigation stage, as no such allegations appear in the complaint filed subsequent to the investigation.

Special counsel to the Commission filed a verified complaint against respondent with the Commission on 14 September 2000. Respondent was served with a copy of the notice of complaint and complaint on 20 September 2000.

The complaint alleged in pertinent part the following:

3. The respondent has subjected a district court judge and a deputy clerk of court to verbal statements and physical acts unbecoming to him and demeaning to the dignity, integrity, and honor of the judicial office on the following occasions:

a. While attending a party at Lake Hickory in the Summer of 1997, the respondent encountered Judge Nancy L. Einstein and her 13-year old daughter on the dock. The respondent, who had been drinking, hugged Judge Einstein and told her he had a "hard-on", indicating he was sexually aroused. The respondent's statement was made in the presence of and loud enough to be heard by Judge Einstein's 13-year old daughter.

b. The respondent held court in Burke County on July 21, 22, and 24, 1998. After court concluded on July 21st, the respondent asked courtroom clerk Tanya L. Isenhour, who had begun employment as a deputy clerk of the Burke County Clerk of Superior Court two (2) months earlier, about her job satisfaction and marital status. The respondent followed these inquiries with specific questions related to whether she went out, where did she go, and what clothing, including underwear, did she wear when she went out. Isenhour told the respondent that her choice of underwear was none of his business. The respondent then asked Isenhour to go to the lake with him on July 24th, but she declined. On July 22nd, the respondent invited Isenhour to go to lunch with him, but she declined. Two (2) days later after court ended on

July 24th, the respondent renewed his invitation to Isenhour to go to the lake by asking her if she had brought her bathing suit. When Isenhour told the respondent she had no bathing suit with her because she was not going to go with the respondent, he suggested she just wear her bra and panties, but Isenhour again declined to go. The respondent did not renew his invitation but asked for a raincheck and again was refused by Isenhour.

The respondent next held court in Burke County on October 27, 28 and 30th, 1998. Isenhour served as the respondent's courtroom clerk for that period and went to his chambers after court on October 30th with continuance orders for his signature. The respondent was on the telephone at the time but signaled Isenhour to stay. When the respondent completed his call, Isenhour asked the respondent if he had missed being in Burke County. The respondent approached Isenhour and said, "I'll show you how much I missed you." The respondent then grabbed her hand in his and rubbed her hand against his genitals, grabbed and rubbed her genitals with his hand, and asked if she could tell that he missed her. Isenhour broke free and protested the respondent's actions, but the respondent approached her again and tried to hug her. When Isenhour pushed the respondent away, he retreated but offered his phone number and indicated he would like to date her and have sexual intercourse with her. Isenhour told the respondent that would not happen, and she knew all about him. The respondent demanded an explanation from her, blocked the door with his hand after grabbing her wrist, and prevented her from leaving until she explained herself.

4. The actions of the respondent constitute willful misconduct in office and conduct prejudicial to the administration of justice that brings the judicial office into disrepute and are in violation of Canons 1, 2A, and 3A(3) of the North Carolina Code of Judicial Conduct.

On 6 October 2000, respondent filed a verified answer, response, and defenses to the complaint, which provided in pertinent part as follows:

3. The initial allegations contained in Paragraph 3 are denied.

a. As to the allegations contained in Subparagraph 3(a) it is admitted that the Respondent, Judge Gregory R. Hayes, attended

a party at Lake Hickory in the summer of 1997 and Judge Nancy L. Einstein was present at the party. It is admitted that the Respondent, Judge Gregory R. Hayes had a social alcoholic drink or drinks as did most guests at the social function including the Complainant Nancy L. Einstein. It is specifically denied that the Respondent, Judge Gregory R. Hayes, hugged Nancy L. Einstein or made any off-color or inappropriate remark to or towards her or in the presence of her daughter. It is further specifically and emphatically denied that he made any remark to Nancy L. Einstein or anyone else concerning the physiological state of his anatomy or male private parts. The Respondent, Judge Gregory R. Hayes' wife was present with the Respondent, Judge Gregory R. Hayes during the entirety of the social function and nothing inappropriate was said or done by the Respondent, Judge Gregory R. Hayes. The remaining allegations contained in Subparagraph 3(a) are denied.

b. As to the allegations contained in Subparagraph 3(b) it is admitted that the Respondent, Judge Gregory R. Hayes as a Judge of the General Court of Justice held Court in Burke County on July 21, 22 and 24, 1998. It is admitted that the deputy courtroom clerk, Tanya L. Isenhour, had begun employment as a deputy clerk under the tenure of the then Clerk of Court, Iva Rhoney. Tanya L. Isenhour had begun her employment some two months earlier. It is admitted that there were conversations between Judge Gregory R. Hayes and the deputy clerk regarding her job satisfaction, her knowledge of the job and her duties and abilities as well as conversations concerning her work. The remainder of the allegations contained in Subparagraph 3(b) are denied.

As to the allegations contained in the last paragraph of Paragraph 3 of the Complaint, it is admitted that the Respondent, Judge Gregory R. Hayes held Court in Burke County on October 27, 28 and 30 in 1998 and that the Complainant deputy clerk served as Courtroom Clerk during that period. It is admitted that as a part of her official duties the Complainant deputy clerk, went into the Judge's Chambers with Continuance Orders for Judge Hayes' signature. It is specifically and emphatically denied that the Respondent, Judge Gregory R. Hayes made any inappropriate advances towards Tanya L. Isenhour or inappropriately approached her or said to her or anyone else "I'll show you how much I missed you", or had made any statement to her in that context. It is specifically and emphatically denied that the

**IN RE HAYES**

[356 N.C. 389 (2002)]

Respondent, Judge Gregory R. Hayes had any physical contact with the Complainant deputy clerk, Tanya L. Isenhour. It is specifically denied that Judge Gregory R. Hayes made any sexual overtures or comments of a sexual nature to the deputy clerk, Tanya L. Isenhour or that the deputy clerk, Tanya L. Isenhour made any statements to him other than statements having to do with the official conduct of the Court's business. It is specifically denied that Judge Gregory R. Hayes made any demands upon the Complainant deputy clerk, Tanya L. Isenhour or that he blocked the door in any way or grabbed her wrist in any way or prevented her from leaving the Judge's Chambers.

4. As the offensive actions complained of did not take place, the conclusions drawn therefrom are specifically and emphatically denied. It is further denied that Judge Gregory R. Hayes took any action which would constitute willful misconduct in office or engaged in conduct which would be prejudicial to the administration of justice or conducted himself in such a manner that would bring the judicial office into disrepute or would be in any way in violation of any of the Canons of the North Carolina Code of Judicial Conduct.

. . . .

8. Judge Gregory R. Hayes is informed and believes and upon such information and belief alleges that Nancy L. Einstein, the deputy clerk, and Larry Ballew, a Morganton attorney, have allied themselves in the making, publishing, and filing of false or frivolous accusations for the common purpose, scheme, or design of attempting to have Judge Gregory R. Hayes wrongfully removed as a duly elected Judge of the General Court of Justice.

a. Larry Ballew, a Morganton attorney, and the complaining attorney in the Ross case filed a written Complaint against Judge Gregory R. Hayes. These charges were found to be unfounded or frivolous by the Commission.

b. Judge Gregory R. Hayes is informed and believes that the complaining deputy clerk is a client of the complaining attorney, Larry Ballew and was at the time that the deputy clerk initially filed or signed an affidavit alleging the false events.

c. Judge Gregory R. Hayes is informed and believes and upon such information and belief alleges that Nancy L. Einstein subsequent to defeat as a District Court Judge is going into the private

practice of law with or share offices with Larry Ballew, the complaining attorney in the Ross case and that they share a mutual dislike of him which predates the time of the false acts of which they have wrongfully accused him.

d. Judge Gregory R. Hayes is informed and believes that the Complainant deputy clerk is the political hiree of the defeated Clerk of Court Iva Rhoney. She was hired after the election in the waning days of the Rhoney administration. When she was hired she lacked the fundamental skills to perform the duties of her office. She has been reprimanded for inappropriate dress. Judge Gregory R. Hayes is further informed and believes that her charges in part are an attempt to keep a position for which she is not qualified.

On 10 October 2000, the Commission served respondent with a notice of formal hearing concerning the charges alleged. The Commission conducted the hearing on 16 and 17 November 2000. Respondent was present and was represented by his attorneys of record. The Commission first addressed allegations that respondent acted improperly toward a fellow judge at a private party and determined that there was not clear and convincing evidence to support these allegations. Accordingly, the Commission made no findings of fact, conclusions of law, or recommendation concerning these allegations. The Commission next addressed allegations of respondent's improper behavior toward Isenhour. In its recommendation entered 18 January 2001, the Commission found clear and convincing evidence that respondent's conduct constituted:

a. conduct in violation of Canons 1, 2A, and 3A(3) of the North Carolina Code of Judicial Conduct;

b. conduct prejudicial to the administration of justice that brings the judicial office into disrepute as defined in *In re Edens*, 290 N.C. 299, 226 S.E.2d 5 (1976); and

c. willful misconduct in office as defined in *In re Nowell*, 293 N.C. 235, 237 S.E.2d 246 (1977).

The Commission then recommended that this Court remove respondent from office.

This matter was filed with this Court on 8 March 2001 and was first heard on 14 May 2001. We noted that the proceedings leading to the Commission's formal hearing in this matter produced numerous

controversies, including the quashing of a subpoena compelling the appearance of Larry A. Ballew, a resident of Georgia licensed to practice law in North Carolina, and the admission of evidence at the hearing concerning respondent's alleged verbal misconduct toward Judge Nancy Einstein at a private party.

As a result of the foregoing, in a mandate dated 7 June 2001, we remanded the matter to the Judicial Standards Commission for further proceedings. *In re Hayes,* 353 N.C. 511, 546 S.E.2d 376 (2001). Because the decision by this Court must rest on our own independent evaluation of the testimony from critical witnesses in this case, we instructed the Commission as follows:

(1) The Commission shall videotape all testimony pertaining to the two alleged incidents involving the deputy clerk.

(2) The Commission shall also videotape and consider all other relevant evidence, admissible under the Rules of Evidence, that bears upon the allegations made by the deputy clerk.

(3) The Commission shall hear only evidence relevant to the allegations of the deputy clerk. The Commission, having previously determined that "there was not clear and convincing evidence to support the allegations" as to the alleged incident between respondent and Judge Einstein, should not consider evidence as to that allegation at the rehearing.

(4) We reverse the decision to quash the subpoena for attorney Larry A. Ballew.

*Id.* at 515-16, 546 S.E.2d at 379.

On 18 February 2002, the Commission served respondent with a notice of rehearing. The Commission conducted the hearing on 27 and 28 February and 1 March 2002, after which the Commission, in its recommendation entered 16 April 2002, made the following finding of fact based on evidence as to Paragraph 3(b) of the complaint:

10. The respondent held court in Burke County on July 21, 22, and 24, 1998. Tanya L. Isenhour (Isenhour), a 22 year old female who began employment as a deputy clerk of the Burke County Clerk of Superior Court on May 19, 1998, served as the respondent's courtroom clerk. During the first two (2) days of that time period, the respondent engaged Isenhour in a conversation which he began with general inquiries about her marital sta-

**IN RE HAYES**

[356 N.C. 389 (2002)]

tus and family and followed with specific inquiries about more personal, intimate matters, including whether and where did she go when she went out, what clothing did she wear when she went out, and whether she wore underwear when she went out. The respondent invited Isenhour to go to the lake with him on July 24th, but she declined and told him she would want to take her family if she were to go. After court ended on July 24th, the respondent renewed his invitation to Isenhour to go to the lake by asking her if she had brought her bathing suit. When Isenhour told the respondent she had no bathing suit with her because she was not going to go with the respondent, he suggested she could go in her underwear, but Isenhour again declined to go.

The respondent next held court in Burke County on October 27, 28, and 30, 1998. Isenhour served as the respondent's courtroom clerk for that period and went to his chambers after court on October 30th with continuance orders for his signature. The respondent was on the telephone at the time but signaled Isenhour to stay. When the respondent completed his call, Isenhour exchanged pleasantries with him and asked the respondent if he had missed being in Burke County. The respondent approached Isenhour and said, "I'll show you how much I missed you." The respondent then took her hand, placed her hand on his genitals, and rubbed her hand against his genitals; placed his other hand on her genitals and rubbed her genitals with his hand; and asked if she could tell that he missed her. Isenhour pushed the respondent away and exclaimed that he was going to cost her her job. The respondent approached her again and tried to hug her. At that point Isenhour told the respondent that she knew about his relationship with another deputy clerk. Blocking the door with one hand and holding Isenhour's wrist with the other hand, the respondent demanded that Isenhour explain how she learned of the relationship, prevented her from leaving until she revealed the source of her information, and warned her not to tell anyone what had just occurred, implying adverse consequences to her if she did so.

The Commission then concluded on the basis of clear and convincing evidence that respondent's conduct as found in finding of fact number 10 constituted:

a. conduct in violation of Canons 1, 2A, and 3A(3) of the North Carolina Code of Judicial Conduct;

   b. conduct prejudicial to the administration of justice that brings
      the judicial office into disrepute as defined in *In re Edens*, 290
      N.C. 299, 226 S.E.2d 5 (1976); and

   c. willful misconduct in office as defined in *In re Nowell*, 293
      N.C. 235, 237 S.E.2d 246 (1977).

The Commission then recommended that this Court remove respondent from judicial office.

The Judicial Standards Commission is created by statute. N.C.G.S. § 7A-375 (2001). The Commission investigates complaints against sitting judges and candidates for judicial office. N.C.G.S. § 7A-377(a) (2001). Commission members act as jurors and make findings of fact. The Commission may compel the attendance of witnesses and the production of evidence; conduct hearings; and recommend to this Court what disciplinary action, if any, should be taken. *Id.* "The Commission serves 'as an arm of the Court to conduct hearings for the purpose of aiding the Supreme Court in determining whether a judge is unfit or unsuitable.'" *In re Tucker*, 348 N.C. 677, 679, 501 S.E.2d 67, 69 (1998) (quoting *In re Hardy*, 294 N.C. 90, 97, 240 S.E.2d 367, 372 (1978)). However, final authority to discipline judges lies solely with the Supreme Court. *In re Peoples*, 296 N.C. 109, 146-47, 250 S.E.2d 890, 911-12 (1978) (discussing the authority of the Commission and disciplinary proceedings), *cert. denied*, 442 U.S. 929, 61 L. Ed. 2d 297 (1979). "[Sections 7A-376 and 7A-377] authorize and empower the Court, unfettered in its adjudication by the recommendation of the Commission, to make the final judgment whether to censure, remove, remand for further proceedings, or dismiss the proceeding." *Hardy*, 294 N.C. at 97-98, 240 S.E.2d at 373.

The Commission's recommendations are not binding upon this Court. *Nowell*, 293 N.C. at 244, 237 S.E.2d at 252. In reviewing the Commission's recommendations pursuant to N.C.G.S. § 7A-376, this Court acts as a court of original jurisdiction, rather than in its usual capacity as an appellate court. *Peoples*, 296 N.C. at 147, 250 S.E.2d at 912. We consider the evidence and then exercise independent judgment as to what discipline, if any, is appropriate. *Nowell*, 293 N.C. at 244, 237 S.E.2d at 252. "Each case arising from the . . . Commission is to be decided upon its own facts." *In re Kivett*, 309 N.C. 635, 664, 309 S.E.2d 442, 459 (1983).

The quantum of proof required in proceedings before the Commission is proof by clear and convincing evidence: "a burden

greater than that of proof of a preponderance of the evidence and less than that of proof beyond a reasonable doubt." *Nowell*, 293 N.C. at 247, 237 S.E.2d at 254.

> Removal of a judge is a matter of the most serious consequences.
>
> [The judge] is, thereby, not only deprived of the honor, power and emoluments of the office for the remainder of his term, but is also permanently disqualified from holding further judicial office in this State and G.S. 7A-376 expressly provides that he "receives no retirement compensation," regardless of how many years he has served with fidelity and distinction or how much he had paid into the State Retirement Fund pursuant to the provisions of the Retirement Act.

*Hardy*, 294 N.C. at 100-01, 240 S.E.2d at 374 (Lake, J., concurring in part and dissenting in part). Justice Lake added:

> The more serious consequence is that the people, who elected him to be their judge, are deprived of his services for the remainder of his term. It is not a light thing for this Court to assume the power to say to the people of North Carolina, "You have lawfully elected this judge, but we have determined that he cannot serve you."

*Id.* at 101, 240 S.E.2d at 374-75.

Respondent first argues that he was denied due process and a fair hearing before the Commission when four members of the Commission who had heard the previous proceeding and had voted to remove respondent failed to recuse themselves. Respondent notes that unbiased and objective fact-finders are critical when a case turns on the credibility of two antagonists, only one of whom is telling the truth. These same four members comprised the majority in recommending respondent's removal upon the rehearing. Respondent contends that although the Commission determined in the first hearing that the allegations concerning Judge Einstein were not supported by clear and convincing evidence, the Commission members were exposed to damaging collateral evidence that may have prejudiced their views.

Even though the matter is reviewed by this Court, fundamental due process and fundamental fairness are required at every stage and every junction of the proceeding. Respondent argues that the four members should have recused themselves because these members

had already recommended removal, and it would be very unlikely that these members would act fairly, impartially, and without a predisposition. Respondent further argues that for the four members to change their recommendation would require them to admit they were wrong the first time.

In addition, respondent argues that he was deprived of a fair hearing when the Commission denied respondent's request to conduct a *voir dire* of the members of the Commission. Respondent contends that the Commission's denial of this request made it impossible for respondent to determine if any of the members had any bias or prejudice that would impair their ability to render a fair and impartial recommendation.

The Commission responds that any alleged partiality by an individual member of the Commission is cured by the final scrutiny of this Court. The Judicial Standards Commission's enabling statute provides that "[i]n a particular case, if a member disqualifies himself, *or is successfully challenged for cause,* his seat for that case shall be filled by an alternate member selected as provided in this subsection." N.C.G.S. § 7A-375(c) (emphasis added). This statute contemplates that respondent has the right to have an opportunity to conduct a *voir dire* of members of the Commission in order to determine if any of the members should be challenged for cause.

In this case, while the better practice would have been for the Commission to allow a *voir dire* of its members to determine if any of them should be challenged for cause, this issue is not the basis on which we decide this matter.

Respondent next argues that he was denied his due process and equal protection rights guaranteed by the Constitutions of both North Carolina and the United States because the mechanism for censure and removal of a member of the judiciary is fundamentally flawed. In addition, respondent argues that the rules of the Judicial Standards Commission do not afford basic procedural guidelines within which to conduct a defense or to contest the Commission's evidence because of the lack of meaningful rules of evidence, procedure, and discovery.

Although respondent concedes that this Court has previously determined that the statutes governing the Judicial Standards Commission, N.C.G.S. ch. 7A, art. 30 (2001), are constitutional and comport with due process, *see, e.g., Nowell,* 293 N.C. 235, 237 S.E.2d

246, he urges this Court to overrule these earlier cases. Respondent argues that the rules of the Judicial Standards Commission do not provide respondent or any similarly situated judge adequate basic procedural guidelines within which to conduct a defense, put forth evidence, conduct discovery, or otherwise prepare for a hearing. The Commission argues that respondent concedes that this Court has held that article 30 of chapter 7A of our General Statutes is constitutional and is not violative of due process, and argues that we should not overrule these precedential cases.

This Court has stated that review of a Judicial Standards Commission proceeding is "a most serious undertaking by this Court." *Kivett*, 309 N.C. at 673, 309 S.E.2d at 464. As noted above, this Court makes its own independent evaluation of the record evidence; finds the facts as they exist; makes conclusions of law based thereon; and makes the ultimate determination as to whether it should censure, remove, or decline to do either. *Nowell*, 293 N.C. at 246, 237 S.E.2d at 253. Thus, notwithstanding the fact that the Commission has made findings of fact and conclusions of law, this Court must review the record presented by the Commission and make its own independent findings and conclusions and decide the appropriate sanction, if any. The *Nowell* decision and its progeny recognize the constitutional deficiencies in the statutes governing the Judicial Standards Commission, but reconcile those deficiencies by relying on this Court as the ultimate finder of fact and arbiter of the truth. Caselaw makes clear that the obvious constitutional problems with the process are "cured" because the Commission makes only a "recommendation." *Nowell*, 293 N.C. at 244, 237 S.E.2d at 252-53; *see also Kivett*, 309 N.C. at 671, 309 S.E.2d at 463.

We recognize that the procedures in place for investigating judicial complaints are far from perfect. There are constant efforts underway to improve the process, and this Court is and remains amenable to rule changes and safeguards. Again, however, we do not feel that resolution of these issues is necessary for a proper determination of this matter. Furthermore, all the courts of this state, including the appellate courts, will avoid constitutional questions, even if properly presented, where a case may be resolved on other grounds. *See State v. Crabtree*, 286 N.C. 541, 543, 212 S.E.2d 103, 105 (1975).

Respondent finally argues that the witnesses gave conflicting testimony that, when subjected to routine methods of determining credibility, does not rise to the level of clear and convincing proof. Respondent contends that, based upon the evidence before the

Commission, there is not sufficient evidence of conduct prejudicial to the administration of justice bringing the office into disrepute as defined in *Edens*, 290 N.C. 299, 226 S.E.2d 5, or of willful misconduct in office as defined in *Nowell*, 293 N.C 235, 237 S.E.2d 246.

We briefly review the evidence. Respondent is a duly elected district court judge of North Carolina's Twenty-Fifth Judicial District. He was elected in 1994 and reelected without opposition in 1998.[1]

Isenhour began her employment with the Burke County Clerk's Office on 19 May 1998, when she was twenty-two years old. Isenhour was hired by Burke County Clerk of Court Iva Rhoney after Rhoney's defeat in the 1998 primary. Isenhour had no prior experience as a clerk. She had been terminated from her previous employment, Bauer Industries, for not coming to work. She remained unemployed from September 1997 until May 1998.

Isenhour alleged that on July 21, 22, and 24, 1998, respondent engaged her in inappropriate conversation regarding her dress and personal life. She testified that respondent invited her to a lake party on 24 July 1998, which invitation she declined. Isenhour admitted that bailiff Vernon Fleming and lawyer Talton Dark were present when this "lake invitation" conversation took place, but both Vernon Fleming and Talton Dark testified that they did not hear any conversation of this nature. Isenhour further admitted that she never told her immediate supervisor, Lynn Richards, or her boss, Clerk of Court Iva Rhoney, about this incident until she filed with the Commission her letter dated 30 June 1999. Isenhour stated that while respondent heard the *Ross* case in May 1998, respondent winked and smiled at her. Marjorie Mundy, an employee of the Administrative Office of the Courts sent to train Isenhour, and Richard Beyer, an attorney in the *Ross* case, testified that they did not witness any such conduct. Mundy further testified that knowing Mundy was new in the area, respondent was very helpful and that Mundy "saw nothing wrong at all." Mundy also testified that Isenhour dressed inappropriately and that her dresses were too short.

Isenhour also alleged that after court on 30 October 1998, while in chambers, respondent took Isenhour's hand and placed it on his private parts and with his other hand rubbed her genitals. Isenhour stated that respondent thereafter prevented her from leaving and warned her not to tell anyone what had transpired. Isenhour admitted

---

1. We also note that respondent was reelected in a contested, nonpartisan race in 2002.

IN RE HAYES

[356 N.C. 389 (2002)]

on cross-examination that although the office for the trial court administrator and the district attorney was next door, she never screamed, but instead, after these alleged assaults occurred, waited for respondent to sign a stack of continuance orders. Isenhour did not report this incident to her supervisor, her boss, or even her boyfriend until 17 February 1999. This was the same day lawyer Ballew and respondent had a confrontation regarding the *Ross* case and the same day that Isenhour became upset after being admonished for using the bathroom adjacent to respondent's chamber. Isenhour admitted that when these alleged assaults took place, the doors to respondent's chamber were unlocked.

Respondent unequivocally denied the accusations made against him by Isenhour. Less than a year prior to Isenhour's filing the complaint, respondent convicted and sentenced her boyfriend for driving while impaired. Isenhour indicated during cross-examination that she talked with Ballew concerning her allegations against respondent. Ballew told Isenhour that if she filed a lawsuit, she would be a very rich woman. Justina Bryan, one of Isenhour's co-workers, testified that Isenhour got the idea of filing her complaint with the Commission from watching a television show. Isenhour told Bryan that because of her filing the complaint, "[A]fter I get through with Judge Hayes, I may not ever have to work another day in my life." Isenhour testified that the first time she wrote down what happened was on Saturday, 6 March 1999, one day after Ballew had written his letter to the Commission.

At the first hearing, Isenhour testified that Ballew told her, "After I get through with Judge Hayes on this matter, I'll never have to work again." At the rehearing, Isenhour testified specifically that Ballew did not make that statement, but rather, that he told Isenhour that if she filed a lawsuit, she could be a very rich woman. At the first hearing, Isenhour testified that during the "lake invitation" conversation of July 1998, respondent had told Talton Dark that Isenhour was coming in her bra and panties. At the second hearing, Isenhour changed her testimony to say that respondent hollered to Talton Dark that Isenhour was coming in a bikini. Dark testified that he never heard respondent holler that statement. Dark acknowledged, however, that he and respondent were friends and that respondent had encouraged him to return to Morganton when Dark lost his job.

Although Isenhour noted in her own handwriting on the skills section of her job application to the clerk's office that she could speak fluent German, she admitted on cross-examination that she did

not know fluent German. Isenhour further represented on the application that she knew sign language, but later admitted that she knew only the signed alphabet.

The Commission submits that there is clear and convincing evidence to support Isenhour's allegations because, in addition to the testimony of Isenhour, the Commission heard corroborating testimony from her co-workers. Justina Bryan testified that on the day in question, 30 October 1998, Isenhour appeared visibly upset and shaken. Fellow clerk Gwen Duplain testified similarly to Isenhour's emotional state, and bailiff Butch Jenkins testified that Isenhour asked him not to leave her alone with respondent. The Commission contends further that this Court, while not always accepting the recommendation of the Commission, has generally accepted the Commission's findings as to the credibility of witnesses. The Commission contends in its brief that it "observed [r]espondent's demeanor during the entire live proceedings and may have *observed clues concerning his credibility* which are not shown on the videotape."

This Court has a duty to remember and consider all of the evidence whether called to our attention by counsel or not, for all of the evidence is important. In the present case, we have scrutinized the record and videotapes of the proceedings, searching for any clues that might shed light on each witness' credibility. We found no such clues that proved or disproved Isenhour's claim. Moreover, because our analysis must be conducted pursuant to a clear and convincing standard of proof, we cannot base our decision on mere credibility "clues."

We also consider the North Carolina pattern jury instructions, which are based on decisions of this Court, for in this case we sit as fact-finders. The pattern instructions include the following:

> The highest aim of every legal contest is the ascertainment of the truth. Somewhere within the facts of every case, the truth abides, and where truth is, justice steps in garbed in its robes and tips the scales. In this case you have no friend to reward, you have no enemy to punish; you have no anger to appease or sorrow to assuage. Yours is a solemn duty to let your verdict speak the everlasting truth.

N.C.P.I.—Crim. 101.36 (1978).

**IN RE HAYES**

[356 N.C. 389 (2002)]

The law requires [the Commission] to prove each element of this issue by evidence which is clear . . . and convincing. (On most issues in civil cases, the law only requires the parties to prove their issues by the greater weight of the evidence. That is not the situation, however, with this issue. Before [the Commission] is entitled to prevail, [it] must prove this issue by clear . . . and convincing evidence.)

Clear . . . and convincing evidence is evidence which, in its character and weight, establishes what [the Commission] seeks to prove in a clear . . . and convincing fashion. You shall interpret and apply the words "clear[]" . . . and "convincing" in accordance with their commonly understood and accepted meanings in everyday speech.

N.C.P.I.—Civil 101.11 (1987).

You are the sole judges of the credibility of each witness.

You must decide for yourselves whether to believe the testimony of any witness. You may believe all, or any part, or none of that testimony.

In determining whether to believe any witness you should use the same tests of truthfulness which you apply in your everyday lives. These tests may include: the opportunity of the witness to see, hear, know, or remember the facts or occurrences about which the witness testified; the manner and appearance of the witness; any interest, bias, or partiality the witness may have; the apparent understanding and fairness of the witness; whether the testimony of the witness is sensible and reasonable; and whether the testimony of the witness is consistent with other believable evidence in the case.

N.C.P.I.—Civil 101.15 (1994).

You are also the sole judges of the weight to be given to any evidence. By this I mean, if you decide that certain evidence is believable, you must then determine the importance of that evidence in the light of all other believable evidence in the case.

N.C.P.I.—Civil 101.20 (1994).

It is your duty to recall and consider *all* of the evidence introduced during the trial. If your recollection of the evidence differs

from that which the attorneys argued to you, you should be guided by your own recollection in your deliberations.

N.C.P.I.—Civil 101.50 (1994) (emphasis added) (footnote omitted).

As we stated succinctly in *Kivett*, "[t]he review of this proceeding has been a most serious undertaking by this Court. The preservation of the due administration of justice and the integrity and independence of the judiciary is one of the most important responsibilities of this Court. History has taught that without it, all else fails." *Kivett*, 309 N.C. at 673, 309 S.E.2d at 464. "[T]he proper focus is on, among other things, the nature and type of conduct, the frequency of occurrences, the impact which knowledge of the conduct would likely have on the prevailing attitudes of the community, and whether the judge acted knowingly or with a reckless disregard for the high standards of the judicial office." *In re Martin*, 302 N.C. 299, 316, 275 S.E.2d 412, 421 (1981).

The testimony concerning this serious charge is in sharp conflict. Based upon our thorough review of the record, transcripts, videotapes, briefs, pertinent caselaw, and arguments presented by counsel, we are of the opinion that the evidence, taken as a whole, is equivocal, contradictory, and, in many instances, ambiguous. After all the evidence has been considered, this case is reduced to the question of precisely what happened, if anything, for a few minutes on the afternoon of 30 October 1998. The testimony of unimpeached witnesses for respondent, when weighed against the testimony of Isenhour, who was impeached, as well as the testimony of other unimpeached witnesses for the Commission, places the evidence in equipoise.

We conclude, therefore, that the evidence does not establish by clear and convincing proof that respondent has pursued any course of conduct that demonstrates that he "*knowingly and wilfully persist[ed] in indiscretions and misconduct* which this Court has declared to be, or *which under the circumstances [respondent] should [have known] to be*, acts which constitute wilful misconduct in office and conduct prejudicial to the administration of justice which brings the judicial office into disrepute," *In re Martin*, 295 N.C. 291, 305-06, 245 S.E.2d 766, 775 (1978) (emphasis added), thereby constituting grounds for removal. *Id.*

For the reasons stated and in the exercise of our independent judgment on this record, we decline to accept the recommendation of the Commission. Therefore, this matter is hereby DISMISSED.

Justices ORR and MARTIN did not participate in the consideration or decision of this proceeding.